UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

LAMAR LANDRY,

    Petitioner,

v.

ERIC ARNOLD,

    Respondent.

Case No. 14-cv-03570-JST

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS**

Re: ECF No. 1

Before the Court is Lamar Landry's petition for a writ of habeas corpus, filed pursuant to 28 U.S.C. § 2254. ECF No. 1. Petitioner contends that his federal constitutional rights were violated by the trial court's admission of statements his co-defendant made to a third party. For the reasons set forth below, the Court will deny the petition.

## I.    PROCEDURAL HISTORY

Petitioner Lamar Landry, along with DeShawn Landry and Eric Greer, were tried jointly as co-defendants.[1] On April 25, 2011, a Santa Clara Superior Court jury found Petitioner guilty of felony assault by means of force likely to produce great bodily injury upon Anthony Mata and found that Petitioner personally inflicted great bodily injury on Mata in the course of that assault. The court subsequently found true the allegations that Petitioner had a prior serious felony conviction and a prior strike conviction. On June 16, 2011, Petitioner was sentenced to a total term of 14 years, consisting of three years for the felony assault, doubled to six years for his strike prior, plus three years for the great bodily injury enhancement, plus an additional five years for his prior serious felony conviction. The court also imposed a concurrent term for a probation violation. On March 13, 2013, the California Court of Appeal affirmed, and on May 22, 2013, the

---

[1] Three other co-defendants – John Downs, Brian Sabathia, and Christopher Leggett – entered into plea deals and were not part of the trial.

California Supreme denied his petition for review. On August 7, 2014, Petitioner filed this action. See ECF No. 1.

## II. STATEMENT OF FACTS

The California Court of Appeal described the evidence presented at trial:[2]

### 1. Eyewitness and police testimony

At approximately 1:30 a.m. on June 16, 2010, Dustin Isaacson was standing outside the VooDoo Lounge, a nightclub where he worked as a security guard. The nightclub was closing, and Isaacson was helping to clear the bar and reduce congestion on the sidewalks, as other clubs in the area close at the same time.

Isaacson heard a loud group of between 15 and 20 people crossing the street from the direction of Toons, another nightclub near the VooDoo Lounge. As Isaacson watched, this group stopped directly across from the VooDoo Lounge and some of those near the front of the group turned towards the ones in the back and there was shouting back and forth. Isaacson thought the groups would split up without further incident, but as some of the people continued to argue, those near the edges returned and a physical fight began. Isaacson called 911.

He continued to observe the fight, and saw a man, later identified as Mata, get thrown to the ground and kicked at least twice in the head. Isaacson recognized a security guard from Toons, whose name he did not know, trying to separate the combatants and trying to pull people off of Mata.

Isaacson flagged down a passing police car, and a second officer arrived just as the fight was breaking up. By the time the police arrived, the other security guard had returned to Toons.

Isaacson, a trained EMT, went to assist Mata. Mata was lying face up, his eyes swollen shut and he was bleeding from the mouth and nose. He had a three-inch long laceration on his forehead, small cuts above his eyebrows and smaller cuts on the side of his face. Mata was conscious and moaning, but could not respond to questions.

Armando Martinez, the manager of Toons, was aware that two Hispanic men had been escorted out of the nightclub shortly before closing. He saw them outside and tried to calm one of them down, then walked them to a nearby parking lot. Martinez saw the two men again a short time later, between Toons and the VooDoo Lounge. The one who had been most upset before was yelling at and taunting passersby, while his companion remained quiet. As Martinez walked towards the two men, several men in the crowd attacked the quieter man and perhaps 10 people went after the louder man. The louder man (Mata) went down and stopped moving, as blood pooled underneath him. Martinez was unable to identify anyone in the crowd of people who attacked Mata and his companion.

Mata went out with his friend, Joey, on the evening of June 15, 2010. Because Joey was not dressed properly for one bar, they went to Toons, which has a more relaxed

---

[2] This summary is presumed correct. See Hernandez v. Small, 282 F.3d 1132, 1135 n.1 (9th Cir. 2002); 28 U.S.C. § 2254(e)(1).


dress code. After consuming six or seven mixed drinks, Mata was carried out of Toons by a bouncer. The next thing he remembers is waking up from a coma in a hospital bed. Mata had bruises on his head, arms, and chest, as well as lacerations on his arms, and stitches above his left eyebrow and on his nose, which left scars. He had a broken nose and a broken bone underneath his eye. At the time of the trial, Mata continued to suffer from short term memory loss and migraines.

After Mata returned to work, a light skinned Black or Latina woman stopped by and talked to him, saying she was the girlfriend of one of the men who attacked him. She "apologized on behalf of the gentleman," gave Mata her phone number and said he should call her if there was anything she could do to help with his medical bills or anything. Though she seemed sincere and he was never threatened by anyone, Mata was slightly afraid because if that woman could find him, so could other people.

San Jose Police Lieutenant David Santos was patrolling in downtown San Jose that evening and happened to be stopped for a red light at the intersection of Second Street and Santa Clara Street, near Toons and the VooDoo Lounge at the time of the incident. Four people ran up to his patrol SUV, and he heard a woman yell, "They're killing him." Santos looked over and saw people running away, with one man lying on the ground, a pool of blood around his head.

A person standing near Santos said, "They're leaving in the black car." Santos saw a black Charger pull out of a parking lot, driving rapidly south on Second Street. Santos pursued the vehicle, which made a right turn onto San Fernando Street. Santos activated his lights and siren and the Charger stopped at the intersection of San Fernando and First Streets.

Santos got out of his SUV, with his weapon drawn, and five people climbed out of the Charger. The men were each looking in different directions and Santos noted that none of them seemed to be paying any attention to him, which he thought odd. He twice ordered the five men to get on the ground, but they did not move. As Santos heard more sirens approaching, the five men ran off in different directions. He broadcast that the men had run off, but Santos remained by the Charger as he saw there were more people inside. Santos ordered them to come out of the car one at a time. A total of four more people exited the vehicle: Greer, Lamar, Sabathia and Leggett.

Officers Phillip Giusto and Jarrod Jesser responded to Santos's reports about stopping the Charger and that some of the suspects had fled northbound on First Street. Santos described the suspects as Black males, including one wearing a white t-shirt and one wearing a red baseball cap. Giusto and Jesser spotted a Black male wearing a white t-shirt, hiding behind a pillar on Post Street at the end of Lightston Street. Jesser contacted the man, later identified as Deshawn, and took him into custody. As Deshawn was sitting on the curb, Jesser noticed spots of blood on Deshawn's white athletic shoes. Jesser took Deshawn's shoes and placed them in evidence collection bags.

Giusto also saw a second suspect, John Downs, wearing a red baseball cap, and ordered him to lie on the ground. Santos identified Deshawn and Downs as two of the five men who had run away from the Charger.

Adrian Gastelo was a security guard at Toons that evening, and tried to break up a fight involving 25 to 30 people outside the nightclub. As the fight was underway, he saw five or six people jump out of a Camry and join in. He overheard one of the people from the Camry, say "there it goes," or "there they go," as he got out of the

3

car. As Gastelo pulled people out of the melee, he could see Mata on the ground, unconscious and bleeding from his head and neck. He tried to protect Mata from further injury, and as the fight broke up, Gastelo heard sirens which caused the remaining people to scatter. As he did not want to get involved, Gastelo first went back into Toons and then went home. He returned to the nightclub after police called and asked him to come back.

At trial, Gastelo testified that he did not, in fact, see the fight start, but only saw the end of it. He did not see Deshawn, Lamar or Greer hit, punch or kick Mata while he was on the ground, and he lied to the police when he identified them as being involved in the fight. Gastelo said that he lied because, when he initially returned to Toons at a police officer's request, another unidentified plainclothes Black police officer called him by his full name, said Gastelo had outstanding warrants and urged him to cooperate fully. A uniformed police officer then came up and asked him what he had seen. Gastelo was afraid he would be arrested if he did not tell the police officer what he wanted to hear, so he described what he had overheard other people in Toons saying about the fight. Based on what he had heard, he told police he saw a tall Black man wearing a purple hat and a purple shirt hit Mata in the back of the head. After Mata fell to the ground, a group of 11 or so Black males kicked and punched him. However, Gastelo denied that he personally witnessed any of that.

In September 2010, police went to Gastelo's house to serve him with a subpoena to testify at the preliminary hearing, but he was not home. In a subsequent phone call, Gastelo told a police officer he would be at work on the afternoon of September 29, but he was not there when police arrived with the subpoena. Gastelo was finally served with the subpoena the following day. In spite of the subpoena, Gastelo failed to appear at the preliminary hearing.

When asked about his failure to appear for the preliminary hearing, Gastelo testified that he ignored it because he "hate[s] court." Instead he went to work, where he was arrested. After spending two days in jail, he was released and subsequently testified at the preliminary hearing, where he said he did not see the fight first-hand and thus did not recognize any of the defendants. According to Gastelo, the only reason he falsely accused the defendants in the first place was in order to avoid being arrested on the unspecified warrants referenced by the unidentified plainclothes officer who spoke to him the night of the assault.

Police Officer Anson Kahaku contradicted Gastelo's trial testimony. Kahaku testified he was the officer who called Gastelo that morning and asked that he return downtown to relate what he had seen. Kahaku said he never checked to see if Gastelo had any outstanding warrants. When Gastelo returned to the nightclub that evening, he was very cooperative.

According to Kahaku, Gastelo said he saw a tall Black man wearing a purple hat and shirt hit Mata on the head from behind, knocking him to the ground. Approximately 11 Black males then kicked and punched Mata as he lay on the ground.

Kahaku took Gastelo to the corner of San Fernando and First Street, where he identified Greer, Lamar, Sabathia and Leggett as part of the group that beat and kicked Mata. Gastelo said Lamar was one of the people that exited the Camry to join the fight and also said that he was the tall man in the purple shirt and hat that hit Mata in the back of the head. Gastelo also specifically said that he witnessed Greer and Lamar kick Mata as he lay on the ground.

4

Kahaku then took Gastelo to another location, where Downs and Deshawn were being held, for a second in-field identification. At the second location, Gastelo said Downs had kicked Mata as he was on the ground. Gastelo said Deshawn was one of the people who had jumped out of the Camry and joined the fight. However, he did not indicate that he saw Deshawn actually hit or kick Mata at any time during the fight. Gastelo heard Deshawn say as he and the others got out of the Camry that they should handle it "one on one."

There was no record in the San Jose Police Department computer system that any officer ran a warrants check for Gastelo during the relevant time period. Also, according to police records, there were four nonuniformed police officers on duty that morning, none of whom were Black. The only uniformed Black officer on duty that evening was Officer Vernon Todd, who assisted Santos after he stopped the Charger. Todd testified he did not speak with Gastelo or any other witnesses outside Toons that evening. Although police dispatch records showed Todd arriving at the scene outside the VooDoo Lounge at approximately 1:35 a.m., Todd said this was likely due to him not advising the dispatcher that he diverted to Santos's location instead of responding to Toons.

### 2. Forensic evidence

As with Deshawn's shoes, Lamar's shoes also appeared to have blood on them and were taken into evidence, along with a purple shirt located in the back seat of the Charger. DNA testing disclosed that Mata was the sole source of the blood on Lamar's and Deshawn's shoes. Mata's DNA was found in blood stains on Greer's shoes. Lamar, Deshawn and Greer also had blood on their clothing.

Criminalist Cordelia Willis studied the blood spatter on Deshawn and Lamar's shoes. According to Willis, the spatter on Deshawn's right shoe consisted of small droplets of blood, which traveled at medium velocity through the air for anywhere from one to four feet before hitting the shoe. The patterns were characteristic of stomping, kicking or other uses of force, and Deshawn's right shoe was approximately one foot away from the blood source at the time it was spattered. However, Willis could not say whether or not Deshawn's shoe came into direct contact with a source of blood; rather, the most she could say was that the blood droplets traveled through the air a short distance before striking his shoe.

### 3. Jailhouse telephone calls

The jury heard edited versions of audio tapes of phone calls made from jail by Deshawn and Greer, as well as a recording of a jail visit between Deshawn and a third party. The calls made by Deshawn were admissible only against him, and concerned efforts to persuade various witnesses to testify either that he was not present at the scene or that he was only trying to help Mata. In the phone calls, Deshawn denied being present at the scene, but during the jail visit, he said the witnesses from Toons could testify they saw him "helping the dude up and helping the dude, ... who, who all got jumped."

A call made by Greer on July 20, 2010, was played at trial and was admitted as a declaration against penal interest and the jurors were instructed that they could also consider it as evidence against all of the codefendants. The portion of that call which was played for the jury consisted of the following exchange: "[Greer]: You know, man. You know, how, you know how San Jose, Santa Clara, man, Santa Clara is one of those counties that even if you don't do nothing they gonna try to get you for doing something. So you know.... [Third party]: Yeah. [Greer]: We, we did something and we're trying to prove that we didn't do nothing. You know, it's

just gonna look a whole lot uglier. [Third party]: Yeah, I know what you mean."

    4. Defense evidence

Corey Maciel, a paramedic who responded to the scene of the fight and assisted Mata, testified that Mata appeared confused and exhibited an altered level of consciousness, giving inappropriate responses to questions. Maciel did not think this was unusual given the injuries Mata had sustained that night.

Investigator Anne Fields, hired by Deshawn's counsel, testified she visited the crime scene in December 2010 and took measurements.

Torian Carrillo, an investigator employed by Fields, testified that she spoke to Armando Martinez during her investigation of this case, but did not threaten him in any way.

Bruce Wiley, an investigator for the Santa Clara County District Attorney's office, testified he interviewed Gastelo, following the preliminary hearing, to discuss why his testimony at that hearing differed from the statements he gave to the police the night of the assault.

People v. Landry, No. H037131, 2013 WL 837068, at *2–*5 (Cal. Ct. App. Mar. 7, 2013), review denied (May 22, 2013).

## III.    LEGAL STANDARD

This Court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a); Rose v. Hodges, 423 U.S. 19, 21 (1975).

A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); Williams v. Taylor, 529 U.S. 362, 412–13 (2000). Additionally, habeas relief is warranted only if the constitutional error at issue had a "substantial and injurious effect or influence in determining the jury's verdict." Penry v. Johnson, 532 U.S. 782, 795 (2001) (internal citation omitted).

A state court decision is "contrary to" clearly established Supreme Court precedent if it "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases," or if it

"confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [its] precedent." Williams, 529 U.S. at 405–06. "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411.

Section 2254(d)(1) restricts the source of clearly established law to the Supreme Court's jurisprudence. "[C]learly established Federal law, as determined by the Supreme Court of the United States" refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." Williams, 529 U.S. at 412 (internal quotation marks omitted). "A federal court may not overrule a state court for simply holding a view different from its own, when the precedent from [the Supreme Court] is, at best, ambiguous." Mitchell v. Esparza, 540 U.S. 12, 17 (2003).

Here, as noted, the California Supreme Court summarily denied Petitioner's petition for review. The Court of Appeal, in its opinion on direct review, addressed the claim Petitioner raises in the instant petition. The Court of Appeal thus was the highest court to have reviewed the claim in a reasoned decision, and, as to that claim, it is the Court of Appeal's decision that this Court reviews here. See Ylst v. Nunnemaker, 501 U.S. 797, 803–04 (1991); Barker v. Fleming, 423 F.3d 1085, 1091–92 (9th Cir. 2005).

## IV. DISCUSSION

Petitioner argues that the admission of Greer's jailhouse telephone conversation with Leggett without a limiting instruction or redaction violated his right to confrontation under the United States Constitution.[3]

The portion of that call played for the jury consisted of the following exchange:

---

[3] Petitioner also makes passing mention of a due process claim.

7

> [Greer]: You know, man. You know, how, you know how San Jose, Santa Clara, man, Santa Clara is one of those counties that even if you don't do nothing they gonna try to get you for doing something. So you know....
>
> [Leggett]: Yeah.
>
> [Greer]: We, we did something and we're trying to prove that we didn't do nothing. You know, it's just gonna look a whole lot uglier.
>
> [Leggett]: Yeah, I know what you mean.

Landry, 2013 WL 837068, at *5. The trial court instructed the jury that this call could be considered as evidence against all defendants, including Petitioner. Ex. A4, CT vol. 4 at 1037.

Petitioner now seeks habeas relief on the grounds that admission of this evidence violated the Confrontation Clause.

### A.     Applying the Confrontation Clause

The Sixth Amendment's Confrontation Clause provides that in criminal cases the accused has the right to "be confronted with witnesses against him." U.S. CONST. AMEND. VI. The ultimate goal of the Confrontation Clause "is to ensure reliability of evidence, but it is a procedural rather than a substantive guarantee. It commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination." Crawford v. Washington, 541 U.S. 36, 61 (2004). The Confrontation Clause applies to all "testimonial" statements. See id. at 50–51. Although the Supreme Court has not provided a strict definition of "testimonial statement," it "typically [consists of] a solemn declaration or affirmation made for the purpose of establishing or proving some fact." Id. at 51 (internal quotation marks and brackets omitted). Testimonial statements include, at a minimum, "prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and . . . police interrogations." Id. at 68.

Before Crawford, Confrontation Clause analysis was governed by the "indicia of reliability" test set out in Ohio v. Roberts, 448 U.S. 56, 65–66 (1980). Under the Roberts test, hearsay statements could be introduced only if the witness was unavailable at trial and the statements had "adequate indicia of reliability," i.e., the statements fell within a "firmly rooted hearsay exception" or bore "particularized guarantees of trustworthiness." Roberts, 448 U.S. at

1    66.  As the Supreme Court made clear in Davis v. Washington, 547 U.S. 813 (2006), however, the
2    Roberts test has no continuing validity post-Crawford.  Nontestimonial hearsay, "while subject to
3    traditional limitations upon hearsay evidence, is not subject to the Confrontation Clause."  Davis,
4    547 U.S. at 821.  The Supreme Court reiterated this point the following term when discussing
5    "Crawford's elimination of Confrontation Clause protection against the admission of unreliable
6    out-of-court nontestimonial statements."  Whorton v. Bockting, 549 U.S. 406, 420 (2007).  As a
7    result, nontestimonial statements are now outside the scope of the protection of the Confrontation
8    Clause.  See United States v. Larson, 495 F.3d 1094, 1099 n.4 (9th Cir. 2007) (en banc);
9    Delgadillo v. Woodford, 527 F.3d 919, 924 (2008) ("Crawford rejected [the Roberts] framework
10   for analyzing Confrontation Clause violations" and nontestimonial statements no longer raise
11   Confrontation Clause concerns).

### B. The California Court of Appeal's Decision

The trial court admitted a portion of Greer's jailhouse call with Leggett as a declaration against penal interest under California Evidence Code section 1230.  On direct appeal, Petitioner argued that the trial court erroneously admitted this statement.  Petitioner conceded that the statement was nontestimonial and limited his challenge to its admission under the declaration against penal interest exception.  The California Court of Appeal concluded that the statement was nontestimonial and that the trial court did not err in admitting the statement against Petitioner.  Landry, 2013 WL 837068, at *9.

In his traverse, Petitioner argues for the first time that the California Court of Appeal applied the wrong legal standard in denying his Confrontation Clause claim because that court relied on Roberts, which was abrogated by Crawford.  ECF No. 24 at 1.  He argues that the Court of Appeal's error requires this Court to review the claim de novo.  Id.

Preliminarily, the Court notes that "[a] traverse is not the proper pleading to raise additional grounds for relief."  Cacoperdo v. Demosthenes, 37 F.3d 504, 507 (9th Cir. 1994).  The Court could reject Petitioner's argument regarding the Court of Appeal's use of the wrong legal standard on this ground alone.  Nonetheless, the Court will proceed to consider Petitioner's argument on the merits.

1    Petitioner is correct that "[w]hen a state court errs by using the wrong legal rule or
2  framework to analyze a petitioner's claim, it "constitute[s] error under the 'contrary to' prong of §
3  2254(d)(1)." Soto v. Grounds, No. C-13-5931 EMC (PR), 2015 WL 1349662, at *14 (N.D. Cal.
4  Mar. 25, 2015) (quoting Frantz v. Hazey, 533 F.3d 724, 734 (9th Cir.2008))  In such an instance,
5  the federal district court "must decide the habeas petition by considering *de novo* the constitutional
6  issues raised." Reyes v. Lewis, 798 F.3d 815, 825–26 (9th Cir. 2015) (citing Williams v. Taylor,
7  529 U.S. 362, 405 (2000)).

8    Here, the California Court of Appeal initially articulated the correct legal standard, noting
9  that "[u]nder Crawford, . . . the Confrontation Clause has no application to [out-of-court,
10  nontestimonial statements not subject to prior cross-examination] and therefore permits their
11  admission even if they lack indicia of reliability." Landry, 2013 WL 837068 at *9 (quoting
12  Whorton v. Bockting, 549 U.S. 406, 420 (2007) and citing Davis v. Washington 547 U.S. 813, 821
13  (2006)).  However, that court then proceeded to analyze the statements at issue under the Roberts
14  test to determine whether they could be admitted without violating the Confrontation Clause. Id.
15  This was error.  As the California Supreme Court noted in People v. Cage, 40 Cal. 4th 965 (2007),
16  "the [United States Supreme Court] has made clear that Roberts . . . and its progeny are overruled
17  for all purposes, and retain no relevance to a determination whether a particular hearsay statement
18  is admissible under the confrontation clause." Id. at 981 n.10.  There simply is "no basis for an
19  inference that, even if a hearsay statement is non-testimonial, it must nonetheless undergo a
20  Roberts analysis before it may be admitted under the Constitution." Id.  Because the Court of
21  Appeal used the wrong legal framework or rule to analyze Petitioner's claim, this Court will
22  review that claim *de novo*.

23    **C.    Analysis**

24    Petitioner argues that under Bruton v. United States, 391 U.S. 123 (1968), the admission of
25  Greer's phone call violated his Sixth Amendment right to confront witnesses and his Fourteenth
26  Amendment right to due process. ECF No. 1 at 13.  In Bruton, the Supreme Court held that
27  admission of non-testifying co-defendant's confession violated the defendant's right to cross-
28  examination under the Confrontation Clause, even though the jury had been instructed to disregard

10

the confession in determining the defendant's guilt.  Bruton, 391 at 126.[4]

The Supreme Court has made clear that, after Crawford, the Confrontation Clause does not apply to nontestimonial hearsay.  Davis, 547 U.S. at 821; Crawford, 541 U.S. at 50–51.  After Crawford, a court must address the question of whether a statement is testimonial before it can proceed with a Bruton analysis.  See United States v. Dargan, 738 F.3d 643, 651 (4th Cir. 2013) ("Bruton is simply irrelevant in the context of nontestimonial statements.  Bruton espoused a prophylactic rule designed to prevent a specific type of Confrontation Clause violation.  Statements that do not implicate the Confrontation Clause, a fortiori, do not implicate Bruton." ); United States v. Berrios, 676 F.3d 118, 128 (3d Cir. 2012) ("[B]ecause Bruton is no more than a by-product of the Confrontation Clause, the Court's holding in Davis and Crawford likewise limit Bruton to testimonial statements"); United States v. Figueroa–Cartagena, 612 F.3d 69, 85 (1st Cir. 2010) ("It is necessary to view Bruton through the lens of Crawford and Davis. The threshold question . . . is whether the challenged statement is testimonial."); United States v. Smalls, 605 F.3d 765, 768 n.2 (10th Cir. 2010) ("the Bruton rule, like the Confrontation Clause upon which it is premised, does not apply to nontestimonial hearsay statements"); United States v. Johnson, 581 F.3d 320, 326 (6th Cir.2009) ("Because it is premised on the Confrontation Clause, the Bruton rule, like the Confrontation Clause itself, does not apply to nontestimonial statements."); United States v. Vargas, 570 F.3d 1004, 1009 (8th Cir.2009) (Bruton does not apply to nontestimonial codefendant statements).

Here, Petitioner conceded on direct appeal that the statements were nontestimonial, see Ex. C1 at 13; Landry, 2013 WL 837068, at *9, and the California Court of Appeal so found.  Landry, 2013 WL 837068, at *9.  Because all parties conceded that Greer's hearsay statements were not testimonial, their admission did not infringe on Petitioner's Sixth Amendment or due process rights and Bruton did not apply.

Petitioner now argues that if Crawford limits Bruton's application only to testimonial

---

[4] Bruton's holding was limited by later cases.  See, e.g., Richardson v. Marsh, 481 U.S. 200, 211 (1987) (holding that Bruton applies only where the statement in question is facially incriminating).  In light of this Court's conclusion that Bruton does not further explicate this area of the law.

statements, Greer's phone call should be deemed to be testimonial. See ECF No. 1 at 20–21. Even if the argument had not been conceded below, however, this Court agrees with the Court of Appeal that the statements made in Greer's telephone call were correctly classified as nontestimonial.

The statements at issue were made in the context of an informal telephone conversation between Greer and Leggett, without any active participation by a government official. See Crawford, 541 U.S. at 51 ("An accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not."). Greer did not make the statements for the "primary purpose" of "establish[ing] or prov[ing] past events potentially relevant to later criminal prosecution." Davis, 547 U.S. at 822 (2006). The phone conversation between Greer and Leggett was the kind of informal communication that courts have repeatedly held to be nontestimonial and outside the protection of the Confrontation Clause. See, e.g., Desai v. Booker, 732 F.3d 628, 630 (6th Cir. 2013) ("the Confrontation Clause no longer applied to nontestimonial hearsay such as the friend-to-friend confession"); United States v. Berrios, 676 F.3d 118, 127–28 (3d Cir. 2012) (admission of evidence of surreptitiously recorded jailhouse conversations between codefendants did not violate the Confrontation Clause because they were not testimonial); United States v. Nguyen, 267 F. App'x 699, 705 (9th Cir. 2008) (finding that statements made between co-conspirators in casual conversation were "plainly non-testimonial" under Crawford); Saechao v. Oregon, 249 F. App'x 678, 679 (9th Cir. 2007) (affirming the determination that tape-recorded statement by a non-testifying co-defendant made during a jailhouse telephone call to a friend was not "testimonial"). Because the hearsay statements were nontestimonial, the admission did not violate Petitioner's Confrontation Clause rights. He is not entitled to habeas relief on this claim.

## V.     CERTIFICATE OF APPEALABILITY

Petitioner has not "made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), and this is not a case in which "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." Slack v. McDaniel, 529 U.S. 473, 484 (2000). Accordingly, a certificate of appealability is denied.

**CONCLUSION**

For the reasons stated above, the petition for a writ of habeas corpus is denied. The Clerk shall close the file.

IT IS SO ORDERED.

Dated: December 22, 2015

_____
JON S. TIGAR
United States District Judge